# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF IOWA
# CEDAR RAPIDS DIVISION

KAREN McMAHON, HEATHER McMAHON, and RONALD PERKINS,

    Plaintiffs,

vs.

TRANSAMERICA LIFE INSURANCE COMPANY,

    Defendant.

No. C17-149-LTS

**ORDER**

_____

## I.    INTRODUCTION

This case is before me on a motion (Doc. No. 16) to dismiss by defendant Transamerica Life Insurance Company (Transamerica). Plaintiffs Karen McMahon (Karen), Heather McMahon (Heather) and Ronald Perkins (Perkins) have filed a resistance (Doc. No. 17) and Transamerica has replied (Doc. No. 23). I find that oral argument is not necessary. *See* N.D. Iowa L.R. 7(c).

## II.    PROCEDURAL HISTORY

On December 11, 2017, plaintiffs filed a purported class action complaint (Doc. No. 1) asserting claims for breach of contract and breach of the implied covenant of good faith and fair dealing. Plaintiffs seek declaratory and injunctive relief in addition to monetary damages. Defendants responded on May 7, 2018, by filing a pre-answer motion (Doc. No. 16) to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6).

## III. APPLICABLE STANDARDS

The Federal Rules of Civil Procedure authorize a pre-answer motion to dismiss for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). The Supreme Court has provided the following guidance in considering whether a pleading properly states a claim:

> Under Federal Rule of Civil Procedure 8(a)(2), a pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." As the Court held in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), the pleading standard Rule 8 announces but does not require detailed factual allegations, but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation. *Id.* at 555. A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do. *Id.* Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement. *Id.* at 557.
>
> To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Id.* at 570. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id.* at 556. The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully. *Id.* Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief. *Id.* at 557.

*Ashcroft v. Iqbal*, 556 U.S. 662, 677-78 (2009) (cleaned up)[1].

Courts assess "plausibility" by "'draw[ing] on [our own] judicial experience and common sense.'" *Whitney v. Guys, Inc.*, 700 F.3d 1118, 1128 (8th Cir. 2012) (quoting *Iqbal*, 556 U.S. at 679). Courts "review the plausibility of the plaintiff's claim as a whole, not the plausibility of each individual allegation." *Id.* (citation omitted). While

---

[1] The parenthetical "(cleaned up)" may be used "when extraneous, residual, non-substantive information has been removed" from a citation, in this case, bracketed modifications, internal quotation marks and duplicative parentheticals. *See, e.g., United States v. Steward*, 880 F.3d 983, 986 & n.2 (8th Cir. 2018).

*factual* plausibility is typically the focus of a Rule 12(b)(6) motion to dismiss, federal courts may dismiss a claim that lacks a cognizable *legal* theory. *See, e.g., Somers v. Apple, Inc.*, 729 F.3d 953, 959 (9th Cir. 2013); *Commonwealth Prop. Advocates, L.L.C. v. Mortg. Elec. Reg. Sys., Inc.*, 680 F.3d 1194, 1202 (10th Cir. 2011); *accord Target Training Int'l, Ltd. v. Lee*, 1 F. Supp. 3d 927, 937 (N.D. Iowa 2014).

## IV. PLAINTIFFS' ALLEGATIONS

Plaintiffs contend that they represent a class of persons who purchased Transamerica's universal life insurance policies in the late 1980s and early 1990s. Doc. No. 1 at ¶¶ 2, 23. They contend that in August 2015, "Transamerica suddenly, unilaterally, and massively began increasing monthly deductions withdrawn from the Policies' accounts, falsely stating the increases were permitted by the terms of the Policies," when in fact the "reasons for imposing the dramatic increases were to: (a) subsidize Transamerica's cost of meeting its interest rate guarantees under the Policies; (b) recoup past losses in violation of the terms of the Policies; and (c) induce Policy terminations by policyholders." *Id*. at ¶ 3.

### A. The Parties

Karen and Heather are residents of Virginia while Perkins is a resident of Wisconsin. Id. at ¶¶ 8-10. Transamerica is an Iowa corporation with its principal place of business in Cedar Rapids, Iowa. *Id*. at ¶ 11.

Karen and Heather are owners of life insurance policies issued by Transamerica. Doc. No. 1 at ¶¶ 8-9. Karen's policy was issued in the 1970s, and on October 15, 1990, was converted to a Transamerica Preferred Policy Owner universal life insurance policy with a face amount of $100,000 (Policy No. 92343459). *Id*. at ¶ 8. Heather's policy – an Assured Life universal life insurance policy with a face value of $100,000 (Policy No. 92996275) – was issued to her father, Edward McMahon, in January 1989. *Id*. at ¶ 9. Edward transferred the policy to Heather prior to August 2015. *Id*. Perkins owns a

TransMax universal life insurance policy with a face amount of $300,000 (Policy No. 92252099). *Id.* In August 2015, each of plaintiffs' policies were subject to the cost increases that form the basis for the complaint. *Id.* at ¶¶ 8-10.

## B.     *The Policies[2]*

As noted above, each plaintiff claims to be the owner of a Transamerica universal life insurance policy (the Policy or Policies). Universal life insurance is more flexible than term or whole life insurance, as policyholders are free to adjust their premium payments:

> Premium payments, which are variable, are deposited in an accumulation account from which monthly cost of insurance and expense charges are deducted. The accumulation account is credited with monthly interest at a nonguaranteed declared rate, but not less than the guaranteed interest rate specified in the policy contract. Universal life insurance policies allow policyholders to change the amount and frequency of premium payments as long as their policies contain sufficient cash value to cover monthly deductions taken.

*Id.* at ¶ 18 & n.2. Importantly, an increase in the "monthly deductions" will correspond with a higher premium payment obligation.

The "monthly deduction" is meant to recover the costs associated with maintaining the Policy. The monthly deduction is withdrawn from the Policy's accumulation account

---

[2] On a motion to dismiss pursuant to Rule 12(b)(6), the court ordinarily cannot consider matters outside the pleadings without converting the motion into a motion for summary judgment. *See* Fed. R. Civ. P. 12(b)(6); *see also Buck v. F.D.I.C.*, 75 F.3d 1285, 1288 n.3 (8th Cir. 1996). However, I may consider documents that are embraced by the pleadings without converting the motion into a summary judgment motion. *See, e.g., Jenisio v. Ozark Airlines, Inc.*, 187 F.3d 970, 972 n.3 (8th Cir. 1999) (citing *Silver v. H & R Block, Inc.*, 105 F.3d 394, 397 (8th Cir. 1997)). Here, plaintiffs attached Karen's policy to the complaint as Exhibit A and allege that all of the policies at issue "share comparable terms." Doc. No. 1 at 7 n.5; Doc. No. 1-2. Because that policy is clearly embraced by the complaint, I will consider it for purposes of addressing Transamerica's motion to dismiss.

4

at the end of each month. *Id.* at ¶ 25. The monthly deduction is equal to "(a) the application of a 'Monthly Deduction Rate' [(MDR)] to the difference between the death benefit and the accumulation value at the beginning of the year; (b) the monthly deduction for any Policy riders; and (c) a Policy fee." *Id.*, *see also* Doc. No. 1-2 at 8 ("The Monthly Deduction is equal to: (a) the [MDR], times .001, times the difference between the death benefit and the accumulation value at the beginning of the year . . ."). [3] The MDR is the most important component of the monthly deduction. While the other two variables are predictable and not subject to change, the MDR may be adjusted at Transamerica's discretion. Doc. No. 1 at ¶ 26.

The Policy describes Transamerica's discretion related to the MDR as follows:

> Monthly Deduction Rates – We will determine the monthly deduction rate for each policy year at the beginning of that year. We will use the insured's age as of that policy year.
>
> A Table of Guaranteed Monthly Deduction Rates is in the policy data. We may use rates lower than these guaranteed monthly deduction rates. We will never use higher rates.

Doc. No. 1-2 at 13. The initial monthly deductions were set at a guaranteed amount for seven years. *Id.* at 7 ("Current monthly deductions are not guaranteed after policy year 7, nor are they estimates for the future."). Plaintiffs allege that the MDRs incorporate various "Cost of Insurance" (COI) variables, such as the age of the insured, Mortality Tables, and certain risk factors (smoking/nonsmoking). *See* Doc. No. 1 at ¶ 27. However, the Table of Guaranteed MDRs does not list the factors that are considered in setting the guaranteed MDRs. Finally, the Policy is classified as "nonparticipating," meaning the policyholders do not share in the profits or losses of the company. Per the

---

[3] In *Fairlie et al. v. Transamerica et al.*, C18-32-LTS, the disputed contract term is referred to as an MDR or a "Cost of Insurance (COI) Rate." The MDR in the McMahon Policy appears to be substantially interchangeable with the MDR in the Fairlier Policy and the COI rate in the Wright Policy.

5

Policy: "We do not distribute past surplus or recover past losses *by changing the monthly deduction rates*." Doc. No. 1-2 at 18 (emphasis added).

Assuming the policyholders have paid sufficient premiums to cover the monthly deductions for the length of the Policy and no other exclusions apply, policyholders reap the benefits of the Policy in one of three ways. First, if the policyholder dies before age 100, the death benefit (the face value of the Policy) will be paid to the policyholder's designated beneficiary. *Id*. at 9. If the policyholder lives to the age of 100, the policyholder is entitled to the Policy's cash value (premiums paid plus interest paid, less monthly deductions). *Id*. at 2-3. Finally, if a policyholder no longer wishes to participate in the insurance plan or the Policy has otherwise lapsed, he or she is entitled to "surrender" the policy and take the cash value of the Policy, less a surrender penalty. *Id*. at 17. Plaintiffs contend the third option is the most valuable option for Transamerica.

## C. *The Claims*

Universal life insurance policies were highly attractive to consumers in the 1980s and 1990s, as a result of historically high interest rates. *Id*. at ¶ 20. Today, however, interest rates are very low, "making it difficult for insurers to credit the rates the insurers promised when they sold the policies twenty years ago." *Id*. at ¶ 21. As a result, the reserve funds held by Transamerica to cover the Policies' guaranteed interest rates have not kept up with Transamerica's projections, leaving it with insufficient money to cover the Policies at a profit. Compounding the problem, Transamerica has suffered cash-flow problems due to its relationship with its ultimate parent company, AEGON NV (AEGON), which demands significant dividend payments. *Id*. at ¶¶ 44-46. In order to solve its cash-flow problem, Transamerica allegedly engineered a series of captive reinsurance transactions, transferring the risk of loss on the Policies to its wholly-owned affiliates. *Id*. at ¶ 45. The transfers generated a purported "surplus reserve credit," which Transamerica relied upon to justify spending from the reserves in the form of significant dividends to AEGON. *Id*. at 46.

Plaintiffs contend that these actions further weakened Transamerica's policy reserves, resulting in near-term losses to its bottom line. *Id.* at 47. "By depleting its capital surplus to benefit its foreign parent company at the expense of its policyholders, Transamerica knowingly increased the potential adverse impact of losses stemming from the Policies' high interest guarantees and other financial reversals." *Id.* According to plaintiffs, Transamerica's increased risk on the Policies led it to suddenly and without precedent increase the MDR for a purpose not permitted by the Policies. *Id.* at ¶¶ 48-55. Plaintiffs contend that no other justification for the MDR increases fits the known facts, as mortality rates have not changed in a meaningful way and Transamerica's reports to regulators demonstrate that the COI for the Policies has not meaningfully changed. *Id.* at ¶¶ 56-61. Plaintiffs allege that Transamerica's ultimate goal is to recoup past losses by encouraging "shock lapses" – a wave of policyholders surrendering their Policies to avoid the higher MDR and corresponding higher monthly premiums. *Id.* at ¶ 65. Plaintiffs contend that these adverse actions were coupled with other underhanded behaviors intended to further induce Policy lapses. *Id.* at ¶ 70. As a result, "thousands of class members are faced with the difficult decision of either paying the exorbitant and unjustified new charges, or forever forgoing the life insurance benefits for which they have dutifully paid premiums for years." *Id.* at ¶ 77.

Plaintiffs assert two claims against Transamerica arising out of the above conduct. Although plaintiffs admit that Transamerica did not raise the MDR above the maximum amount guaranteed by the Policies, plaintiffs contend that Transamerica nevertheless breached the Policies by increasing the MDR for reasons not permitted by the terms of the Policies (specifically, to recover Transamerica's past losses). Further, plaintiffs contend that even if Transamerica did not technically breach the Policies, its conduct constitutes a breach of the implied covenant of good faith and fair dealing. They contend that Transamerica misrepresented the reason for the MDR increases and intended the increases for improper purposes, including inducing shock lapses, negating the value of

7

the guaranteed interest rates and recovering past losses. *Id.* at ¶¶ 100-06. Plaintiffs seek monetary damages, as well as declaratory and injunctive relief.

## V. DISCUSSION

Transamerica argues that plaintiffs fail to state a claim for breach of contract because the Policies do not limit which factors Transamerica takes into consideration when setting the MDRs, as long as Transamerica does not exceed the maximum guaranteed MDRs. Regarding plaintiffs' claim for breach of the implied covenant of good faith and fair dealing, Transamerica repeats its argument that it did not breach the contract, and contends as a result that it did not injure plaintiffs' rights under the Policies. Finally, Transamerica claims that plaintiffs' request for declaratory judgment must be dismissed because it is duplicative of the breach of contract claim. Plaintiffs generally resist. The parties are proceeding under the assumption that Iowa law applies. As such, I will do the same.

### A. *Count One—Breach of Contract*

Transamerica contends that this case is controlled by this contract term:

> We will determine the monthly deduction rate for each policy year at the beginning of that year. We will use the insured's age as of that policy year. A Table of Guaranteed [MDRs] is in the Policy Data. *We may use rates lower than these guaranteed [MDRs]. We will never use higher rates.*

Doc. No. 1-2 at 8 (emphasis added). Because Transamerica did not exceed the guaranteed MDR, it argues, it did not breach the Policies. Transamerica argues that any other interpretation of this term would require rewriting the Policies to add additional terms. Plaintiffs respond that other contractual language provides context that supports their interpretation of the Policies. Transamerica counters that even if the Policies' terms somehow limit their discretion to set the MDRs up to the guaranteed maximum rate, plaintiffs have failed to plausibly allege that they exercised their discretion contrary to the terms of the Policies.

Under Iowa law:

[T]o establish a claim for a breach of contract, the [plaintiff] must show:

> (1) The existence of a contract; (2) the terms and conditions of the contract; (3) that it has performed all the terms and conditions required under the contract; (4) the defendant's breach of the contract in some particular way; and (5) that plaintiff has suffered damages as a result of the breach.

*Iowa Arboretum, Inc. v. Iowa 4-H Found.*, 886 N.W.2d 695, 706 (Iowa 2016) (citation omitted). Here, the precise meaning of the terms and conditions of the contract are in dispute. Plaintiffs contend that in raising the MDRs in August 2015, Transamerica considered its own past losses rather than the future cost of maintaining the Policies and mortality-related factors. The allegations in the complaint, accepted as true, plausibly establish for the purposes of this motion that the Transamerica's actions were intended to recover past losses. Therefore, the only issue is whether such action could be considered a breach of the contract. A number of federal district courts have considered a similar challenge to the type of policy at issue, although neither the Eighth Circuit Court of Appeals nor the Iowa Supreme Court appear to have weighed in on the precise contract language at issue.

In *Norem v. Lincoln Ben. Life. Ins. Co.*, No. 10 C 2233, 2012 WL 1034495 (N.D. Ill. Mar. 20, 2012), the policy stated that the "cost of insurance (COI)" rates would be "based on the insured's sex, issue age, policy year, and payment class. The rates will be determined by us, but they will never be more than the guaranteed rates shown on Page 5." *Id.* at *1. It was undisputed that the defendant considered those factors, as well as "anticipated death benefit costs, expected policy lapse rates, expected premium persistency, investment earnings assumptions, expenses, including agent commissions, acquisition and maintenance expenses, taxes, policy size and expected distributions . . ." in setting the COI rates. *Id.* The plaintiff argued that those factors that were unrelated

9

to the insured's sex, issue age, policy year and payment class were impermissible considerations according to the meaning of the phrase "based on" in the policy. *Id.*

The court concluded that the term "based on" meant that the listed factors were "the foundation, principal components, or fundamental ingredients of the COI rates but not the exclusive factors to be considered in setting those rates." *Id.* Thus, plaintiff's claim failed as a matter of law in the absence of a COI rate above the guaranteed maximum rate. *Id.* at *2. The District of New Jersey reached a similar decision in *Coffman v. Pruco Life Ins. Co.*, No. 10-CV-03663(DMC)(MF), 2011 WL 4550152 (D.N.J. Sept. 29, 2011), a case in which the policy charged a "maximum monthly rate" that was "based on the Commissioners 1980 Standard Ordinary Smokers Mortality Table," and provided that the defendant "may charge less than these rates." *Id.* at *1, *3 ("Plaintiff wants this Court to insert the word 'only' and/or 'true' into 'expected cost of mortality' so that the Policy is akin to 'Defendant can only consider its expected cost of mortality.'").

In California, however, three groups of plaintiffs have succeeded in stating a claim for breach of contract against Transamerica with regard to policies that are substantially similar to the Policies at issue here. In *Feller v. Transamerica Life Ins. Co.*, 2:16-cv-01378-CAS (AJWx), 2016 WL 6602561 (C.D. Cal. Nov. 8, 2016), "[a]ll of the policies at issue . . . connect the MDR to *at least* the policyholder's age and whether or not they are a smoker" and some of the policies "equate the MDR with the 'cost of insurance' ('COI')." *Id.* at *9. In denying Transamerica's motion to dismiss, the court explained:

> Whether or not Transamerica is permitted to consider other factors, certain provisions in the policy can be read to preclude consideration of the policy's own guaranteed interest. For instance, if certain interest rate accruals are "guaranteed," a plausible reading of the policies is that defendants may not directly offset them by increasing the MDR based on its interest obligations.
>
> In light of the foregoing, and accepting plaintiffs' allegations as true, the Court concludes that the policies' language is reasonably susceptible to plaintiffs' interpretation, namely, the policies could reasonably be read as

requiring that MDR changes be connected to mortality costs and risk categories among policyholders.

*Id.* at *10; *see also id.* at *11 ("Defendant appears to acknowledge that, if it did raise MDRs to recoup past losses, it would constitute breach of contract."). The Central District of California has reached similar conclusions in two other cases: *EFG Bank AG, Cayman Branch v. Transamerica Life Ins. Co.*, 2:16-cv-08104-CAS (AJWx), 2017 WL 3017596, at *6 (C.D. Cal. July 7, 2017) ("[P]laintiffs are not required to allege that MDRs increased above the maximum amount in order to state a claim for breach. Instead, as they do here, plaintiffs may allege an impermissible MDR increase."); *DCD Partners, LLC v. Transamerica Life Ins. Co.*, No. CV15-3238-CAS(VBKx), 2015 WL 12697657, at *6 (C.D. Cal. Dec. 23, 2015) ("[P]laintiffs do not merely allege a change in the MDR. Rather, they allege that, as of January of this year, premium rates had increased by 135.8%).

Transamerica argues that the *Norem* and *Coffman* cases are better reasoned, and should control, because they stick to the "plain language" and "four corners" of the Policies, whereas the court in California "rewrites" the Policies. Transamerica argues that the stated limitation on its discretion to set the MDR – up to the maximum guaranteed rates – forecloses consideration of other, unstated limitations on its discretion. Transamerica further argues that the placement of the non-participation clause under a separate header than the grant of discretion to set the MDRs demonstrates that the non-participation clause has no effect on Transamerica's discretion to set the MDR (up to the maximum guaranteed rate). These arguments are unpersuasive at this stage in the case.

When interpreting contracts,

> [Iowa courts] give effect to the language of the entire contract according to its commonly accepted and ordinary meaning. Moreover, particular words and phrases are not interpreted in isolation. Instead, they are interpreted in a context in which they are used. Furthermore, the words are given the meaning at the time the contract was executed.

11

*Hartig Drug Co. v. Hartig*, 602 N.W.2d 794, 797-98 (Iowa 1999) (citations omitted). A cardinal rule of contract construction or interpretation is that the intent of the parties must control. *Id.* at 797 (citation omitted). "If the contract is ambiguous and uncertain, extrinsic evidence can be considered to help determine intent." *Id.* (citation omitted). Further, although courts do not "rewrite" contract terms:

> Reading an existing contractual provision as having an essential corollary is different from adding a new implied term to a contract. The former is an interpretive exercise and is permissible even if the agreement is integrated. An integrated contract can contain an implicit, unstated, but necessary term . . . . It is of no relevance if the promise, albeit imperfectly expressed, is implicit in the contract as written.

*Alta Vista Props., LLC v. Mauer Vision Ctr., PC*, 855 N.W.2d 722, 729 (Iowa 2014) (cleaned up).

Transamerica's interpretation of the grant of discretion comports with a "plain meaning" interpretation only by ignoring other parts of the Policy. *Hartig Drug*, 602 N.W.2d at 797 ("[P]articular words are not interpreted in isolation."). Although the phrases "We will determine" the MDR and "We may use rates lower . . . [w]e will never use higher rates" suggest substantial grants of discretion to Transamerica when read in isolation, other Policy terms provide apparent limitations on the ability to exercise that discretion. Several terms provide some support for an argument that Transamerica's discretion in setting the MDR is limited to COI factors. First, the fact that the MDR is based (at least in part) on the insured's age as of the policy year supports an interpretation that the MDR is tied to COI factors such as mortality. *See* Doc. No. 1-2 at 13 ("We will use the Insured's age as of that policy year."). Second, under the "General Provisions" heading, the Policy provides that a misstatement of Age or Sex in the application – both factors that affect the COI – will result in a correction of past monthly deduction amounts, further tying the MDR to commonly understood COI factors.

Third, the "cash values"[4] under the policy are "based on the guaranteed monthly deduction rates and the guaranteed interest rate." The "minimum cash values" are tied to "the Commissioner[']s 1980 Standard Ordinary Smoker/Nonsmoker Combined Ultimate Mortality Tables for males and females, age nearest birthday and 4% interest." *Id*. The repeated references to mortality factors supports an inference that the MDR accounts for the cost of insuring policy holders, not for Transamerica's profitability. *See Langlas v. Iowa Life Ins.*, 63 N.W.2d 885, 887 (Iowa 1954) (the language of an insurance contract "must be given its common and ordinary meaning and *must be construed as popularly understood*." (emphasis added)).

Finally, the Policy contains a "No Dividends are Payable" term, which states: "We do not . . . recover past losses by changing the [MDRs]." *Id*. This is the clearest indicator that the MDR may not be manipulated for the purposes alleged by plaintiffs. Transamerica makes much of the placement of this term under the "General Provisions" heading, arguing that the fact that the "sentence is not placed with the provisions granting [Transamerica] discretion to set interest rates and MDRs where it would be expected if it were intended as an additional limitation on [its] discretion to adjust MDRs." *See* Doc. No. 16-1 at 16. This argument ignores the plain language of the term, which describes a prohibited use of the MDR. Although the placement of contract provisions and the text of headings is to be considered in contract interpretation, *Biermann Elec. v. Larson & Larson Const., LLC*, No. 13-0467, 2014 WL 69672, *5 (Iowa Ct. App. Jan. 9, 2014), the placement of the "No Dividends are Payable" term should not be construed to render the provision prohibiting "recover[ing] past losses by changing the MDRs" meaningless.

I agree with the court in *Feller* that the Policies at issue are susceptible to plaintiffs' interpretation. It is apparent from the face of the contract that Transamerica cannot consider its past losses in exercising its discretion to set the MDR, and it is plausible that

---

[4] As discussed above, the "cash value" of the Policy is the amount the policyholder is entitled to recover (less a forfeiture fee) in the event that the Policy lapses.

there are other limitations on its exercise of discretion. Because plaintiffs have adequately plead that Transamerica considered past losses and factors other than those related to the COI in raising the MDR, Transamerica's motion to dismiss Count One is denied.

### B.     *Count Two—Breach of the Implied Covenant of Good Faith*

Transamerica argues that plaintiffs fail to state a claim for contractual breach of the implied covenant of good faith and fair dealing because they have failed to plead that Transamerica "technically complied with the contract while acting contrary to the purpose for which the contract was made." Doc. No. 16-1 at 18. Put another way, because Transamerica argues that the breach of contract claim is unsupported by the Policies' terms, and because plaintiffs allege a violation of the Policies' terms, the claim for a breach of the implied covenant is not a natural fit for these facts. Plaintiffs respond that Transamerica's MDR increase, while within the maximum guaranteed MDRs promised by the Policies, constitutes bad faith because it undermines the parties' rights in the contracts and was undertaken for the purpose of causing plaintiffs to terminate their life insurance Policies early, at a benefit to Transamerica.

The implied covenant of good faith and fair dealing "inheres in all contracts and cannot be disclaimed." *Alta Vista*, 855 N.W.2d at 130 (citing *Fogel v. Trs. Of Iowa Coll.*, 446 N.W.2d 451, 456 (Iowa 1989). "The underlying principle is that there is an implied covenant that neither party will do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Id.* (citation omitted). This implied covenant generally operates upon a condition or term of a contract that is subject to the control of one of the parties. *See, e.g. Midw. Mgmt. Corp. v. Stephens*, 291 N.W.2d 896, 913 (Iowa 1980) (stating that a contract affording one party "sole discretion" to terminate the contract required party "to exercise that discretion in a reasonable manner on the basis of fair dealing and good faith."). However, the covenant "does not give rise to new substantive terms that do not otherwise exist in the contract." *Bagelmann v. First Nat'l Bank*, 823 N.W.2d 18, 34 (Iowa 2012)

14

(citation omitted). "Instead . . . the covenant prevents one party from using technical compliance with a contract as a shield from liability when that party is acting for a purpose contrary to that for which the contract was made." *Mid-Am. Real Estate Co. v. Iowa Realty Co.*, 406 F.3d 969, 974 (8th Cir. 2005).

    Plaintiffs allege four bases for this claim:

    Transamerica exercised its discretion in bad faith and breached the implied covenant of good faith and fair dealing by, among other things:

        a.    Exercising its discretion to increase the [MDR] to recoup past losses;

        b.    Misrepresenting to Plaintiffs and class members the reasons for the [MDR] increase

        c.    Intending for the [MDR] increase to force Plaintiffs and class members to surrender their Policies so Transamerica would not have to pay the death benefits; and

        d.    Negating the value of what were intended to be guaranteed interest rates, which Transamerica has no right to do.

Doc. No. 1 at ¶ 104.

    Plaintiffs have plausibly alleged that their purpose in purchasing the Policies was to secure affordable life insurance while taking advantage of the guaranteed interest rate and avoiding the potential risks of a future economic downturn. Plaintiffs have also plausibly alleged that by raising the MDR for the purpose of inducing shock lapses and by misrepresenting the reasons for the MDR increase, Transamerica has acted in bad faith to undermine plaintiffs' rights in the Policies. Transamerica's argument that it did not raise the MDR's above the guaranteed maximum rate misses the point, because technical compliance with the contract terms does not defeat a claim for breach of the implied covenant of good faith and fair dealing. *See Mid-Am.*, 406 F.3d at 974; *see also Midwest Mgmt.*, 291 N.W.2d at 913 (describing duty "to exercise [] discretion in a reasonable manner on the basis of fair dealing and good faith."). Transamerica's argument that it did not raise the MDRs for the purposes alleged ignores the directive, at

this stage of the case, to accept the factual allegations of the complaint as true. *Ashcroft*, 556 U.S. at 677. Transamerica's motion to dismiss Count Two is denied.

### C.     *Declaratory Judgment*

Finally, Transamerica argues that plaintiffs' request for declaratory judgment should be dismissed as duplicative of the breach of contract claim. Specifically, Transamerica argues that "when a request for declaratory judgment simply asks the court to declare that the contract was breached, it 'is nothing more than a petition claiming breach of contract' and may be dismissed." Doc. No. 16-1 at 23 (citing *Daum v. Planit Solutions Inc.*, 619 F. Supp. 2d 652, 657 (D. Minn. 2009)). Plaintiffs respond that simply resolving the breach of contract claim may not resolve the full reach of the parties' respective rights and responsibilities under the Policies.

The Declaratory Judgment Act provides that, "[I]n a case of actual controversy within its jurisdiction . . . any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201. Federal Rule of Civil Procedure 57 further clarifies that "[t]he existence of another adequate remedy does not preclude a declaratory judgment that is otherwise appropriate." Fed. R. Civ. P. 57. "[D]istrict courts possess discretion in determining whether and when to entertain an action under the Declaratory Judgment Act, even when the suit otherwise satisfied subject matter jurisdiction." *Wilton v. Seven Falls Co.*, 515 U.S. 277, 282 (1995).

Although there is overlap between the claim for breach of contract and the request for a declaratory judgment, such that the claims may be considered duplicative, it is unclear at this point whether resolution of plaintiffs' breach of contract claim would necessarily resolve the parties' prospective rights under the Policies. Dismissal of the declaratory judgment action is premature. Defendant's motion to dismiss will be denied.

## VI. CONCLUSION

For the reasons discussed above, defendant's motion to dismiss (Doc. No. 16) is **denied** in its entirety.

**IT IS SO ORDERED.**

**DATED** this 11th day of July, 2018.

_____
Leonard T. Strand, Chief Judge